**E. R. RICE and M. Metzenbaum,**
**Appellants,**

v.

**Hans MAY, Appellee.**

**No. 14426.**

United States Court of Appeals
Ninth Circuit.

Feb. 29, 1956.

Marvin A. Freeman, Milton A. Krug, Los Angeles, Cal., for appellants.

George E. Bodle, Los Angeles, Cal., James Landye, Portland, Or., Louis R. Stein, Bodle & Landye, Los Angeles, Cal., for appellee.

Before STEPHENS, FEE and CHAMBERS, Circuit Judges.

CHAMBERS, Circuit Judge.

Herein Hans May, a Philadelphia doctor, seeks to recover $11,500 from E. R. Rice and Mr. Metzenbaum, Los Angeles, oil lease buyers and sellers, for a fractional interest in a tract of oil land

called the Rankin in Kern County, California, together with the same fractional interest in the owner's interest in the oil leases to which the property was subject. The doctor originally bought the interest from the defendants. Shortly after the purchase, he became dissatisfied and they then agreed to buy it back for what he had paid for it. The district court held that May, the plaintiff, was entitled to judgment against Rice and Metzenbaum, the defendants, for the amount prayed for less certain deductions for royalties received by the doctor. In turn, Dr. May was ordered to reconvey to the defendants the interest he had previously acquired from them. The defendants appeal.

Sometime prior to November, 1950, Rice and Metzenbaum, had sold to Dr. May a fractional interest in an oil property in Texas called the "Crutchfield." On that, the investment was about half of the amount paid for the interest in Rankin. And the returns to him on the Crutchfield turned out to be excellent, if not handsome.

After preliminary correspondence on the Rankin, Rice went to see Dr. May in Philadelphia about September 1, 1950. And the agreement to purchase the Rankin interest at a price greatly in excess of the cost of the interest to Rice and Metzenbaum who were simultaneously acquiring it resulted.[1] The principal evidence of the original agreement is in escrow instructions, dated September 27, 1950, to a branch office of the Bank of America at Bakersfield, California. These escrow instructions provided that the sellers would obtain a "permit and authorization of the Commissioner of Corporations of the State of California authorizing and permitting said conveyance." Apparently the deed was recorded about seven weeks thereafter and title insurance written thereon in the name of Dr. May, the permit to sell being issued by the Commissioner of Corporations on November 14, 1950. Evidently, Dr. May before the trial of the case never saw the permit or the conditions of it, although the original permit was referred to in his deed. If he had seen it, in this court's view, it would make little difference.

The permit was entitled "In the Matter of the Application of Mr. Metzenbaum and Miriam Metzenbaum, his wife, and E. R. Rice and Grace M. Rice, his wife, for a permit authorizing the sale and issuance of securities." Then it recited, inter alia, that one of the conditions of the permit was as follows:

"(a) That none of the securities authorized to be sold and issued under Paragraph 1 hereof shall be sold or issued unless and until applicant first shall have selected an escrow holder and said escrow holder shall have been first approved in writing by the Commissioner of Corporations; that when issued the securities may be forthwith recorded with County Recorder of the county in which is situated the property to which the securities relate, and a duplicate original of said securities may be filed in accordance with any applicable state or federal regulation; that said securities shall be delivered to said escrow holder immediately thereafter, to be held in escrow pending the further written order of said escrow holder for said securities shall be filed with said Commissioner; *and that the owner or person entitled to said securities shall not consummate a sale, assignment, or transfer of said securities or any interest therein, or receive any consideration therefor, until the written consent or permit of said Commissioner shall have been obtained so to do.*"[2]

---

1. The landowners' (all fractional interests) was a royalty of 12½%. Rice and Metzenbaum bought 12/1000th interest in that 12½% for $12,500. Simultaneously, in a double escrow, they sold to Dr. May 8/1000th for $11,500. The Commissioner didn't think that unreasonable.

2. Emphasis supplied.

The italicized portions, if binding on Dr. May, do literally seem to apply to him. The effect, if any, of this condition will be considered hereinafter.

The returns to the doctor from the Rankin proved disappointing. Sometime prior to December 19, 1950, he called Rice via long distance telephone. There is not a shred of testimony that he accused Rice or Metzenbaum any time before the spring or summer of 1952 of fraud. In his conversations, he told Rice that he was keenly disappointed, that the property had not produced what Rice had "promised."

On December 19, 1950, Rice wrote to May, "However, doctor, if at the end of the next six months, you should be dissatisfied, I shall arrange to take over your interest at your purchase price." On February 1, 1951, by letter, Dr. May advised Rice that "I shall avail myself of your offer of December 19, 1950, to purchase from me at the end of six months my royalty interest in the Rankin Royalty at the price which I had paid for it, $11,500." Rice confirmed on April 11, 1951, his offer of December 19, when he wrote to Dr. May, "Please be advised that I am making arrangements to take over your interest in the Rankin Royalty at the end of the six-month period as stipulated in my letter of December 19, 1950."

Performance was due June 19, 1951, and at this maturity date, the conduct of Rice and Metzenbaum was that which one usually encounters when the debtor doesn't have the money to meet what is due. There were several letters and telephone conversations. Rice sent Dr. May $1,000 on July 23, 1951, and a check for $500 on August 31, 1951. There were hard luck excuses and a request for installment payments. The doctor insisted that he must have his money in full and refused to cash the checks. He employed one Roland Swaffield, a Long Beach attorney, to demand payment in full from Rice and Metzenbaum. Swaffield wrote demand letters and threatened suit. Even yet, the defendants had not been accused of fraud.

Being at the mouth of the gun of Dr. May's threatened suit in the summer of 1951, Rice and Metzenbaum found their way to their attorney's office. There they were advised they had a defense. They were told that the doctor had not complied with the "conditions" imposed by the commissioner in the original permit to transfer concerning a resale by a transferee, i. e. that Dr. May must have a permit to transfer and hadn't secured it. Apparently, they were advised irrespective of the commissioner's written condition in the original permit, that the California Corporate Securities Act required the commissioner's written consent to the transfer.

No money being forthcoming, Dr. May obtained lawyers other than Swaffield, his original counsel. In his behalf in district court, they filed on May 7, 1952, a two-horned suit. The first claim, standing on the agreement to buy back and seeking to enforce it, was a claim for specific performance: a demand for a money judgment for $11,500 against Rice and Metzenbaum (less deductions for royalties received) which was coupled with an offer to convey the royalty back. No performance of any kind on the part of Dr. May was alleged, but the complaint stated that Dr. May was ready, willing and able to perform. In this first claim, it is pleaded that one of the considerations in the December, 1950, offer to buy back was to forestall a prospective suit by Dr. May. A possible inference of this pleading would be that the threatened suit would have alleged fraud. However, the answer of Rice and Metzenbaum denied that this factor of possible suit for fraud had anything to do with the repurchase agreement.

The second claim of the complaint called fraud by its name: fraud.

Then the prayer asked:

1. For judgment on the first claim.

2. If recovery could not be had on the claim, then for a rescission and a

restoration of the status quo ante. (In substance, by whatever name called, the end result of 1 and 2 would be the same.)

3. If recovery could not be had under 1, or rescission under 2, then for damages "to which plaintiff may be entitled under the premises."

Defendants' answer, other than denials, set up plaintiff's. failure to obtain the "Blue Sky" permit for retransfer and also vowed that defendants "have rescinded, have advised plaintiff of the rescission, and do now rescind the transaction."

Upon trial, plaintiff utterly failed to prove any fraud. He admitted he knew in advance he had entered into a highly hazardous undertaking. The defense was the failure to obtain the permit for reconveyance.

The case was submitted to the district judge for decision. He found no fraud and disregarded the second cause of action. Upon the first claim, he found a permit from the Corporation Commissioner of California no obstacle. He granted judgment for the plaintiff against the defendants for $11,500, less royalties collected, and ordered the plaintiff to reconvey the royalty interest to the defendants. At this point, the defendants added a new lawyer to their staff. This resulted in new points asserted for defendants which first appear in the case in the motion for new trial. These new points form much of the basis of appellant-defendants' appeal herein.

The motion for new trial speaks of abandonment by the plaintiff of the repurchase agreement and acquiescence therein by the defendants, of lack of consideration and failure of considera-

tion, and breach of the agreement by plaintiff. This was the background for the argument there and here that one of the real considerations, never recited orally by anyone at the time or found in any document of the parties in entering into the contract was to get plaintiff's agreement (if existing at all, it must be implied in law) not to sue the defendants for fraud. The second cause of action and its prayer for rescission or damages, so runs the thread, resulted in a failure of consideration, an abandonment of the repurchase contract and a rescission of the repurchase agreement by the plaintiff.

These defenses are all affirmative defenses and were not pleaded. Therefore, no attention should be paid to them. The facts upon which some of the defenses are predicated, defendants naturally would argue are in the record. But even when, on the face of a complaint, it appears beyond doubt that the statute of limitations, for example, has run, he who claims it must affirmatively assert it, before the case is submitted for decision.

But let us assume that the special defenses brought up after submission were in the case before submission. They seem to have little merit.

The proof is not here that plaintiff at any time before December 19, 1950, ever threatened suit against defendants. Before that time, his was a complaint that he wasn't happy with the results: the royalty wasn't producing what it ought to produce according to defendant Rice's advance representations as to what it should produce. It is doubtful if any promise not to sue is impliable here.[3]

3. In a memorandum of decision (not in the findings) the trial court mistakenly says:
"Although there was no fraud, plaintiff very shortly (after the purchase) expressed dissatisfaction with his purchase and threatened defendants with legal action, which in. the light of all the conversations and correspondence, defendants might well have believed to have been either threatened action for rescission based on breach of a warranty, an action for damages on the theory of fraud, or an action for relief based upon a theory of failure of consideration. The evidence at the trial does not show that any of such causes of action actually existed but it does show that although an exact theory was not definitely articulated, plaintiff did have an intent to pursue some one or more of the theories by filing an action at law or in equity

But assume that the promise not to sue is to be implied here. Assume the filing of the second claim in plaintiff's complaint would ordinarily be a breach of such an implied condition. When did it come? It came months after defendants' almost 90% failure of performance, i. e. the tendering of $1,000 at one time and of $500 at another, instead of the $11,500 required. It came at a time when defendants say by their answer they (why they, one may wonder) had told plaintiff they had rescinded the contract.

If breach it be at the time it occurred, it would be trivial, because defendants' performance was overdue; certainly not grounds for denying plaintiff specific performance.

Defendants do not speak of plaintiff's complaint as an election of remedies. It is obvious that plaintiff did not intend to elect the remedy of rescission or suit for damages (for fraud). He asked for those remedies as second and third choices—if he couldn't get the first one of specific performance. There seems to be no argument under the liberal rules of pleading in the Federal courts and generally elsewhere, that the plaintiff made no election of remedies at the threshold or during the trial. The court held he was only entitled to the first remedy and gave it to him.

Not having elected his remedies, affirmance vs. rescission, the points made by defendants, beginning with the motion for new trial, fall of their own weight, even if they were made timely. Therefore, this leaves for consideration the issue of "did the plaintiff have to have a permit?" And, if he did, where does that leave the case?

Here it is appropriate to set forth certain sections of the California Securities Law, Corporations Code:

"§ 25008. Security. 'Security' includes all of the following:

"(a) Any stock, including treasury stock; any certificate of interest or participation; any certificate of interest in a profit-sharing agreement; any certificate of interest in an oil, gas, or mining title or lease; any transferable share, investment contract, or beneficial interest in title to property, profits, or earnings.

\* \* \* \* \*

"§ 25009. Sale; sell.

"(a) 'Sale' or 'sell' includes every disposition, or attempt to dispose, of a security or interest in a security for value.

"'Sale' or 'sell' includes all of the following, whether done directly or by an agent, circular letter, advertisement, or otherwise: An offer to sell; an attempt to sell; a solicitation of a sale; an option of a sale; a contract of sale; a taking of a subscription; an exchange; any change in the rights, preferences, privileges, or restrictions on outstanding securities.

\* \* \* \* \*

"§ 25150. Judicial sale of securities. Except as expressly provided in this division, the Corporate Securities Law does not apply to the sale of any security at any judicial, executor's, administrator's, or guardian's sale, or at any sale by a receiver or trustee in insolvency or bankruptcy.

\* \* \* \* \*

"§ 25152. Sale of Securities by owner for own account. Except as

against defendants, and defendants understood that such a law suit was a very real prospect."

The foregoing statement that a law suit was threatened or suggested before December 19, 1950, has no basis in the record. Probably, the court was confused as to dates and was thinking of attorney Swaffield's threats to sue made

after June 19, 1951, and perhaps it was these misstatements about "threat of suit" inducing the repurchase agreement that unloosed the barrage of points on the motion for new trial and on this appeal asserting that Dr. May breached his agreement not to sue or breached an implied condition to the same effect.

expressly provided in this division, the Corporate Securities Law does not apply to the sale of securities when (a) made by or on behalf of a vendor not the issuer or underwriter thereof who, being a bona fide owner of the securities, disposes of his own property for his own account, and (b) the sale is not made, directly or indirectly, for the benefit of the issuer or an underwriter of the security, or for the direct or indirect promotion of any scheme or enterprise with the intent of violating or evading any provision of the Corporate Securities Law.

\* \* \* \* \*

"§ 25308. Authority to establish rules and regulations. The commissioner may establish such rules and regulations as are reasonable or necessary to carry out the purposes and provisions of this division.

\* \* \* \* \*

"§ 25508. Authority to impose conditions for protection of public. The commissioner may impose conditions requiring the deposit in escrow of securities, the impoundment of the proceeds from the sale thereof, limiting the expense in connection with the sale thereof, the waiver of assets and dividends by the holders of promotional securities, and such other conditions as he deems reasonable and necessary or advisable for the protection of the public and the purchasers of the securities."

Pursuant to the authority contained in Section 25308, the Commissioner of Corporations has published a regulation, among others, as follows:

Sec. 421, Title 10, California Administrative Code:

"Application for Permission to Transfer Royalty Interest in Escrow. An application for permission to transfer royalty or mineral interests in escrow shall contain the following:

"(a) A statement signed by the proposed transferor describing the interest to be sold, the consideration to be paid therefor, and the name of the transferee.

"(b) A statement signed by the proposed transferee that the transferor disclosed to the transferee:

"(1) The date the proposed transferor acquired the interest.

"(2) The source from which the proposed transferor acquired the interest.

"(3) The valuation of the interest and the basis upon which such valuation was determined.

"(4) That none of the proceeds of the transfer will be applied directly or indirectly to the promotion, development or operation of the wells or properties on which the interest is based.

"(5) That the assignment or transfer of the interest will be recorded by the proposed transferor on behalf of the proposed transferee in the county in which the property on which the interest is based is located; or, that the proposed transferee has been instructed by the proposed transferor to record said assignment.

"(c) A written commitment by the producing company, or the holder of the leasehold if there is no producing company, or the original issuer of the interest, or an authorized disbursing agent to whom the proceeds from the interest are to be paid, that it will recognize the proposed transferee as owner of such interest, and will pay all royalties to which such interest is entitled to the transferee."

If California has said that he who personally sells back to him from whom he bought is subject to compliance with provisions of the Corporate Securities Act and regulations thereunder, then it is our duty to enforce the California law. No case convinces us that California would so hold. Whether Cali-

fornia would reason that the restoration of the status quo ante was not really a sale, a theory relied upon by the trial court, or that the transfer back by the owner personally to the former owner is a sale that is exempt, one cannot be sure.

Certainly such transactions furnished no motivation for the adoption of the Corporate Securities Act. And what evil lurks in such a transaction that a commissioner's scrutinizing eye is needed to watch? Certainly the purpose of the act would weigh heavily in a California court's mind when construing the act.

But say the defendants: "Dr. May accepted the commissioner's condition written into the permit under which Dr. May took the royalty." Maybe so, but it seems doubtful. Would a California court uphold regulations affecting transactions previously excluded by the act, such as a rescission or a sale by owner for his own account? See Sec. 25152, supra. The natural thing would be to construe the regulation as not intended to cover transactions outside the act. Likewise, would a California court enforce a condition imposed by a commissioner beyond the scope of the act? The natural construction of the condition would be that it is intended to cover transfers already within the act. Would California permit the commissioner to treble his duties by bringing under the act solely by regulation the sale of farm land? Would one who accepted a transfer of farm land subject to the commissioner's condition that a new permit must be secured be bound to get the permit? Such is nonsense. But is it any more so than the idea that a commissioner should protect a good salesman from his unhappy buyer when the latter succeeds in convincing the salesman he ought to buy the royalty back?

But let us assume that the retransfer of the royalty interest was subject to the commissioner's condition in the permit, either by reason of the law giving the commissioner the power to impose the condition or by the acquiescence of Dr. May in the condition of the permit when he accepted his deed from Rice and Metzenbaum. This is not the original issuance of securities, void without a permit if the law be applicable. It is the matter of transfer on which the commissioner claims the power to supervise. He says in the permit: "And that the owner or person entitled to said securities (Dr. May) shall not *consummate* [4] a sale, assignment or transfer of said securities or any interest therein, or *receive any consideration* [4] therefor, until the written consent or permit of said commissioner shall have been obtained so to do." To this court, this is language which contemplates that ordinarily the contract for the sale will have been made before the deal is brought to the commissioner. It comes to him for approval before closing. What else could his regulation, Sec. 421, supra, mean when it requires that the transferor and the transferee must sign the application for transfer.

It is probable that the payment of the consideration, getting the permit, and transferring the deed are all mutually concurrent conditions. If this were a case where Dr. May, required with the cooperation of Metzenbaum and Rice, to get a permit, had brought a suit on June 20, 1951, for $11,500 with no word from Rice and Metzenbaum about performance, then Dr. May would have failed to perform a concurrent condition. But that was not the case. When he moved, by suing, Rice and Metzenbaum had breached the contract by tendering less than due. Further, they advised Dr. May they could not perform. So, for the time being, the permit business on Dr. May's part was excused. Also, the defendants say in their answer they had notified the plaintiff they had rescinded. One who rescinds without excuse repudiates. That also excused Dr. May, for the time being,

---

**4.** Emphasis supplied.

if he needed an excuse. See Williston on Contracts, 3rd Ed., Sec. 676. Further, in the setting of inability to perform, refusal to perform and announced rescission by Rice and Metzenbaum, the failure at this juncture by Dr. May to get the permit would have little materiality. Sec. 275, Restatement of Contracts.

Assuming it is necessary that the permit for retransfer should be obtained, the appellant cites authority to the effect that courts do not grant relief when some act of discretion remains to be done by an administrative agency not within its control. It is true that courts should not have to run the risk (and will not ordinarily do so) of having their orders frustrated by an administrative agency. On the other hand, should this court assume that the California commissioner, who let Rice and Metzenbaum in a double escrow acquire the interest from others at a price less than the price of the resale to Dr. May, would refuse to let Dr. May transfer the security back to Rice and Metzenbaum for what they sold it to Dr. May? Rather it should be governed by common sense and assumed that the transaction will be as automatic as the purchase and sale of a postage stamp.

The court is firmly of the opinion that no permit is necessary. All that is required is for Dr. May to deposit the deed in court for delivery to defendants whenever the money is placed there by defendants.

The judgment is affirmed as rendered.

However, the trial court is authorized to modify the judgment so that the matter may be handled conveniently to the defendants and may provide that the consent of the commissioner can be obtained by the cooperation of the parties, if the permit be desired by Rice and Metzenbaum.

The trial court also may probe the applicability of Rule 70, Federal Rules of Civil Procedure, 28 U.S.C.A., a question not presently before this court.